O. E. BUTTERWORTH, Appellee, v. FARMERS & MERCHANTS STATE BANK, Appellant.

No. 40594.

APRIL 10, 1931.

*Parsons & Mills* and *A. C. Richardson,* for appellant.

*D. M. Kelleher,* for appellee.

GRIMM, J.—It appears from the record that, on the first day of November, 1928, the plaintiff, by his attorney, Kelleher, forwarded to one George Quandt, cashier of the Farmers & Merchants State Bank, Austin, Minnesota, Certificate No. 159 for 10

shares of the capital stock of the said Farmers and Merchants State Bank, issued to Claude and D. R. Spieker, and indorsed in blank under date of September 20, 1927. The letter of transmittal contains, among other things, the following:

"The understanding is, and the instructions under which I send you this certificate, as follows: The sum of $900 is to be remitted by you to the writer which I will hold for Mr. Butterworth's account; otherwise the inclosed certificate is to be returned in the inclosed stamped envelope. If the $900 is forwarded, this certificate may be disposed of as Mr. Spieker may order and direct. In other words it is subject to disposition by Mr. Spieker upon the express condition that $900 shall be remitted to the writer which I will hold to the account of Mr. O. E. Butterworth. I am inclosing stamped envelope for forwarding the amount or the return of the certificate in the event for any reason this understanding is not recognized."

Historically, it may be stated that the Spiekers owed the plaintiff on a promissory note, upon which there was due at that time approximately $1,200. The plaintiff held, as collateral security to the payment of said unpaid balance of $1,200 on the note, said certificate of stock in the Farmers & Merchants State Bank. The Spiekers desired to get the stock released, presumably in order that they, the Spiekers, might dispose of it. After negotiations between the Spiekers and Butterworth, it was finally agreed that the plaintiff would surrender the stock upon payment of $900, and it was understood that the stock should be sent by Kelleher to Mr. George Quandt, who was then cashier of the defendant bank, and the $900 would be forthcoming. Butterworth, on November 1st, wrote a letter to Quandt, advising him as follows:

"I have this day made a partial settlement with Claude Spieker and D. R. Spieker wherein I am to release ten shares of bank stock that I hold as collateral on the Farmers & Merchants State Bank of Austin, Minn. I am having my attorney, Mr. D. M. Kelleher of Fort Dodge, Iowa, forward to you the above ten shares of bank stock. Upon receipt of this stock, you are to remit to Mr. Kelleher the sum of nine hundred dollars ($900.00). I am writing you this letter at the request of Claude Spieker."

One of the Spiekers had designated in writing to the plaintiff to whom the stock should be sent, as follows: "Geo. Quandt, Cashier, Farmers & Merchants State, Austin, Minn."

On November 12th, Mr. Kelleher wrote another letter to the cashier, referring to the former letter and its terms, as follows:

"Mr. George Quandt, Cashier,        . November 12, 1928.
"Farmers & Merchants State Bank
"Austin, Minnesota.                                   |

                                       "Butterworth vs. Spieker.

"Dear Sir:

"Several days ago I wrote you inclosing certificate of stock upon the express condition that the stock should be returned in the stamped envelope inclosed or the sum of $900.00 sent for my client O. E. Butterworth. I have heard nothing from you and Mr. Butterworth is disappointed at my failure to get a report. Can you not let me hear from you by return mail?

                                     "Yours very truly,
"DMK:C                                 D. M. Kelleher."

On November 15th, Quandt wrote Kelleher, as follows:

"Answering your letter of November 12th regarding Butterworth vs. Spieker. I have been unable to make a deal but I expect that something will develop in the next ten days and as soon as it does, I will either remit to you or instruct you of the developments. If this is satisfactory, I will retain the stock until I hear from you again."

Several other letters followed between the parties. On December 4, 1928, the bank failed. On December 5th, Quandt wrote Kelleher as follows:

"Replying to your various letters concerning the $900.00 due Mr. Butterworth on the sale of the Farmers & Merchants State Bank, Austin, Minnesota, bank stock. An assessment of 100% was levied on this stock shortly after Mr. Spieker was in Austin making arrangements with me for a deal to take over the stock. I told him I would take it over, but under the conditions nothing can be done. We have been working on a plan to overcome the collapse of the bank, but the crash came yesterday morning. There is nothing that I can do and will be glad to return the stock if you care to have it."

On December 11th, Kelleher wrote Quandt, among other things, as follows:

"Now, Mr. Butterworth, properly as I think, takes the position that you owe the $900.00. Naturally he is not asking for the return of the certificate at this late date, and in view of what you advise has happened to the Bank."

In the meantime a receipt was executed and delivered, in words and figures as follows, to wit:

"Austin, Minn. November 5, 1928

"Received of D. R. Spieker Nine Hundred Dollars in payment of collection received from Kelleher & Mitchell, Lawyers, Ft. Dodge, Iowa, for Ten shares of stock of the Farmers & Merchants State Bank, Austin, Minn., the said shares of stock to be delivered to Geo. W. Quandt.

"Farmers & Merchants State Bank,
"By G. W. Quandt, Cashier."

The Farmers & Merchants State Bank was reorganized on the 4th day of March, 1929. The old bank had a capital of $75,000 and surplus of $10,000. The new bank's capital was $60,000 and surplus $12,000. On the reorganization of the old bank, all of the old stock, except two shares which could not be located, because they had previously belonged to a defunct bank, was surrendered. The capital of the new bank was based upon the purchase of new shares at par, plus $20, or $120 per share. The reorganization was under statutes of the state of Minnesota, providing, among other things, for the consent of depositors and other interested parties.

There was a trial of the cause to the court, a jury having been waived. The court found for the plaintiff, and allowed a recovery of $900, with interest at 6 per cent per annum from the 1st day of November, 1928. From this ruling the defendant appeals.

I. One of the contentions of the appellant is that, if it be assumed, for the sake of the argument only, that the bank converted the stock of the plaintiff, the recovery would be limited to the value of the stock; and the appellant claims that the stock, on November 1, 1928, when it was forwarded to the bank, was worthless, and continued worthless up to the time of the trial.

The president of the reorganized bank, who was also interested in the old bank, testified on the trial that the stock in question was worthless on November 1, 1928, and continued to be worthless up to the date of the trial. On the other hand, however, there is evidence in the record that this stock was the subject of a transaction between the plaintiff and the Spiekers upon a basis of $900. Moreover, the receipt of the defendant bank hereinbefore referred to is evidence that D. R. Spieker paid into the bank $900 for the stock in question.

Under all of these circumstances and others appearing in the record, we cannot say, as a matter of law, that the stock was worthless. It was for the trial court, sitting in the place of a jury, to pass upon this question as one of fact, and it found the stock to be of the value of $900; and with this finding we may not interfere, regardless of what we might find, were the case before us for trial *de novo*.

II. It is one of the contentions of the appellant that this entire transaction involved George W. Quandt personally, and not the bank, and that therefore the bank, regardless of what may have transpired, cannot be held responsible to the plaintiff. This also became a question of fact upon the trial.

There is much evidence in the record to the effect that the Spiekers intended the stock should be sent to Quandt personally, and not to Quandt as cashier or managing officer of the bank, and there is much in the correspondence sustaining this point; but, on January 9, 1929, Mr. Peterson, an officer of the bank, wrote Kelleher a letter, containing, among other things, the following:

"Your favor, addressed to Mr. George Quandt, Cashier of this bank, has been handed to me for answer in order that this matter may be forced to a head. * * * This bank was closed on the 3rd day of December, and consequently the stock is of no value. We have written to the Spiekers who have agreed to any surrendering of their stock which is held as collateral. We now, therefore, suggest to you that either your client forward to this bank $100.00 per share, or $1,000.00, which is the assessment that will be placed upon it, or that you surrender same to the bank for the purpose of cancellation. We do not care to go through the process of selling the same for what can be, and credit same upon the obligation of any assessed party. You will confer a

favor upon the banking department, as well as this bank, if you will surrender this certificate to the State Banking Department for cancellation, and avoid the process of foreclosure which would bring you nothing and delay reorganization of this bank.''

Later, on January 14, 1929, Peterson again wrote Kelleher, and in the letter there is contained, among other things, the following:

''I think you will readily understand that the correspondence with Mr. Quandt, as Cashier, is to the bank, and the stock was technically in the hands of the bank for the performance of certain requirements between George Quandt as the individual and Mr. Spieker. The failure on the part of either to perform his duty would not be binding upon the bank. Therefore, the bank is not involved in this matter.''

On January 18, 1929, Mr. Peterson again wrote Kelleher a letter, which contained, among other things, the following:

''I feel, however, that coming down to the justness of the matter, the security your client holds is of no value, and in fact a liability, and both Mr. Spieker and Mr. Quandt have surrendered their other stock in order to avoid an assessment, and it will be best to have your client do likewise; otherwise we will have to force an assessment, which will make your paper entirely worthless.''

Objections were made to the introduction of these letters, and the evidence was taken subject to the objection. The writer was an officer of the bank before it collapsed, and he was active in assisting the banking department in closing up the business of the bank and in its reorganization. He became an officer of the reorganized bank. Upon the question whether the transaction under consideration was with Quandt or the bank, the letters were properly admitted.

Mr. Peterson was a witness at the trial. He was interrogated in reference to making an assessment and selling the stock for payment, and he said: ''We did not do that with reference to the ten shares, because it was delivered to the bank.'' This had reference to the ten shares in controversy.

There is evidence in the record to the effect that Quandt held

these 10 shares in his own personal possession until sometime after the bank failed.

Without further quoting from or referring to the testimony on the subject, suffice it to say that there was a conflict in the evidence as to whether these shares of stock were received in Austin, Minnesota, by Quandt personally, or by Quandt as managing officer of the bank. It was for the trial court to determine, upon this conflict in the evidence; and while there was no memorandum of the finding of facts filed by the court, yet the court must have found that the bank handled the transaction, rather than Quandt personally, and with this finding of fact we may not interfere.

III. It is the contention of the appellant that it' never received any money in connection with the entire transaction. A representative of the bank so testified on the trial. There is in evidence, however, the receipt of the bank, dated November 5, 1928, showing the receipt of $900. We need not here discuss the question of the authority of the cashier to issue such a receipt, or of its effect, having in mind that the evidence tends to show that he was personally interested in the transaction. Suffice it to say, it raised a conflict in the evidence on the subject of the receipt by the bank of $900 for the stock. Upon such a conflict in the evidence in a law action, we cannot say that the court was wrong in finding that the bank had received $900 in exchange for the certificate of stock in question.

It is the contention of the appellant that there was no contract between the plaintiff and the defendant for the payment of $900 by the defendant to the plaintiff for the stock in question. With that contention we may, for the purposes of this opinion, agree; but nevertheless, if there came into the bank the sum of $900 in exchange for the certificate of stock, manifestly that $900 belongs to the plaintiff, and not to the defendant. There being a conflict of evidence in the case on the question of whether $900 did come into the bank, it was for the court to determine the issue and with the court's findings we may not interfere, regardless of what we might do, were we trying the case *de novo*.

Upon the whole case, in view of the manner in which the

case was tried, we find no reversible error, and the cause must be, and is,—*Affirmed.*

STEVENS, ALBERT, KINDIG, and WAGNER, JJ., concur.

MORLING, J., specially concurs in result.